THOMAS C. CALLAN, *Appellant*, v. G. M. CYPHER COMPANY, A CORPORATION, *Appellee*.

Opinion filed January 20, 1916.

1. The proprietor of land may use a natural watercourse which flows through his land for the purpose of emptying into it by means of ditches dug on his own land the surface water thereon, provided such proprietor neither diverts the natural flow of the surface water nor taxes by such means the watercourse beyond its capacity to the injury of a lower proprietor.

2. Whether a proprietor of land who uses a natural watercourse flowing through his land for the purpose of draining his land of surface water is limited in such use of the watercourse by its capacity or the rule against diverting the natural flow of the surface water is not determined in this case.

3. A proprietor of land on a natural watercourse who by obstructions such as dams and causeways diminishes its capacity for carrying off water, may not complain of an upper proprietor who uses the watercourse for draining into it his surface water without diverting its natural flow but does

not tax such watercourse beyond its natural capacity although such use results in injury to the obstructions built by the lower proprietor. .

Appeal from Circuit Court, Manatee County; F. A. Whitney, Judge.

Bill dismissed.

*Howard P. Macfarlane,* for Appellant;

*Singeltary & Reaves,* for Appellee.

ELLIS, J.—Thomas C. Callan filed his bill in the Circuit Court for Manatee County against G. M. Cypher Company, a corporation, to enjoin the latter from using a certain creek or natural drain, running through complainant's lands, to receive the surface waters upon defendant's lands which were collected and conducted to the natural drain or creek by means of a ditch which the defendant had constructed upon its land.

Upon the filing of the bill of complaint and before the defendant answered, the Chancellor on the 28th day of July, 1913, issued a temporary injunction against the defendant "enjoining and restraining the defendant from permitting or allowing the water to flow in said ditch and empty into said natural drain from a point two hundred feet west of the line marking the east boundary of N. W. ¼ of S. E. ¼ of Sec. 25, Tp. 35 S., Range 17 E. That is, that no water east of said point be allowed to flow through said ditch to said natural drain until further order of court." On the 30th day of July, 1913, the complainant filed his bond in the sum of two hundred

dollars as the order directed. The bond was duly approved and the order became effective.

On the 7th day of August, 1913, the defendant answered the bill and included in its answer a demurrer upon the ground that the bill of complaint contained no equity, and that its allegations showed that the defendant was conveying surface water from its own land into a natural water course on its own land.

Upon filing the answer the defendant by its solicitor moved the court to dissolve the temporary injunction and at the same time filed the affidavit of L. F. Peifley, the local manager of the defendant company, to the effect that the ditch had been constructed to a point 262 feet east of the point described in the injunctional order, that the ditch does not extend to any pond, slough or other body of water, but ends in the pine woods, and that the banks of the ditch between the point named in the order and the present end of the ditch prevent surface water from the surrounding country running into the ditch between those points; that putting a dam across the ditch at the point named in the order would not decrease the flow of water through the ditch as it then existed, but would tend to injure the defendant, who was engaged in developing the land and selling it in small lots, by delaying and preventing sales.

Upon the hearing, the court denied the motion, but modified the order "so as to permit the defendant to leave the ditch open as the same now exists, the end of the said ditch being sixty-two feet east of the quarter section line marking the east boundary of N. W. ¼ of S. E. ¼ of Section 25, Township 35 South, Range 17 East; provided, however, the said defendant shall not

permit the water to flow over the banks of said ditch and into the same east of the point described in the original order."

A special master was appointed to take testimony and report the same to the court. On December 1st, 1913, the master submitted the testimony taken by him.

The record discloses that on the 18th day of December, 1913, the complainant filed an amended bill of complaint, and thereafter the defendant answered the amended bill, and by agreement further testimony was taken by the special master and reported, and on the 10th day of September, 1914, the court rendered the following decree:

"The foregoing cause having come on for final hearing upon the pleadings, evidence taken before the court and the report of testimony submitted by H. S. Glazier, Esq., and the same having been fully argued by counsel for the respective parties, and the court having carefully considered and weighed the testimony as well as the law in the case as submitted and insisted upon by the attorneys for the complainant and defendant respectively, is of the opinion that a wide difference should be taken between one diverting surface water over the land of another and ditching water on one's own land into a natural drainway on one's own land. In the latter case the capacity of the drain way is the test.

"Complainant contends for his right to maintain a fish pond and dam at the mouth of a natural drain although part of the said natural drain is as much on the land of the defendant as that of the complainant, extending as it does through the lands of both parties. At the same time defendant admits that water which would

naturally find its way into that drain way can be now rightfully put in there by ditches. It does not appear that the dam and fish pond would not be washed out by the water naturally finding its way there without ditches as well as with one.

"With the utmost care and study of the record, I am unable to apply a test or criterion or principle founded on the apportionment of waters to their natural runs. From experience I take it that the quantity fallen has much to do with it, but how can it be possible to apply counsel's contention to each run and legally say what ditches the upper proprietor may dig that will exactly apportion the water under any conditions. If his principle were correct then each lower proprietor could make it against defendant until the practical result would be that no upper proprietor and no court could apply the principle as long as runways were involved.

"The only logical test is that collected from the adjudged cases relating to natural drains, to-wit, the capacity of the drain, and where the drain extends on both the upper and lower proprietor each has equal right to it, and I can only justify complainant's contention on the theory that he has some vested rights in the mouth of Callan's drain that would permit him to maintain a dam and fish pond to the exclusion of the rights of drainage in others.

"I find, and no authority cited justifies such a theory, nor would it be natural logic or justice without authority. A bridge across the mouth or back from it would obviate all the damage or rather inconvenience complainant has as yet shown.

"In considering the consequence of complainant's

contention I am inevitably led to the conclusion that it would result in a monopoly by law by a lower proprietor of the mouth of a drain in similar cases to the record here presented, and a practical prohibition on lower drainage from the impossibility of applying the natural flow on this record to each drain. I think the capacity test is the true one, as it is the logical and just one, as it is also the only one of possible application, on this record.

"As defendant stands back of the claim that the ditch will not overtax and as it does not as yet appear that it will, but as complainant has shown partial right in this record not to have it so overtaxed, defendant should assume the responsibility of not doing so as if it does in the future it could condemn land and relieve the over burden by several ditches. The injunction should be modified to allow the drainage subject to not over-taxing the Callan run and the cost should be apportioned.

"It is therefore upon consideration ordered, adjudged and decreed that the temporary injunction heretofore issued in said cause be, and the same is hereby modified so as to allow the defendant to run water from its land into the Callan drain so long as the capacity of the Callan Drain is not thereby exceeded.

"It is further ordered that one-half of the cost in this case, including the fees due the Master as shown by his report, and the witness fees as shown by the Master's report, together with the further costs to be herein taxed by the Clerk, shall be paid by the complainant, and one-half by the defendant.

"Done and Ordered at Chambers this 10 day of September, A. D. 1914.

"(Signed)          F. A. WHITNEY, Judge."

From this decree the complainant appealed, and assigned five errors, as follows:

"First. That the court erred in allowing said defendant by means of an artificial ditch to drain surface water from its lands which from the natural slope and drainage of said lands naturally found its way into at least two natural water courses to a third natural water course running through the lands of defendant and complainant, complainant being the lower proprietor, to which from the natural slope and drainage of said land said surface water would not naturally find its way.

"Second. That the court erred in holding that surface water can be diverted from its natural course of drainage and emptied into a natural water way running through the lands of defendant and complainant, complainant being the lower proprietor, into which from the natural slope and drainage of the land it would not naturally find its way.

"Third. That the court erred in allowing defendant to construct and maintain a ditch cut through a natural water shed for the purpose of collecting surface water lying on the far side of said water shed carrying same through said water shed and emptying same into a natural water way running through the lands of defendant and complainant, complainant being the lower proprietor, other than the natural water ways into which from the natural slope of the country it would have found its way.

"Fourth. That the court erred in holding that the sole limit upon the right of defendant to artificially drain surface water from its lands into a natural water way flowing through the lands of both defendant and com-

plainant, complainant being the lower proprietor, is the capacity of said natural water way.

"Fifth.    That the court ererd in holding that said defendant has the right by means of an artificial ditch to drain surface water from its lands into a natural water way flowing through the lands of both complainant and defendant, the complainant being the lower proprietor, so long as the capacity of said natural water way is not exceeded, irrespective of whether or not said surface water so drained into said natural water way would from the natural slope and drainage of said lands find its way into said natural water way."

The appellee filed cross assignments of error as follows:

"First.    The court erred in making the order dated July 28, 1913, granting a temporary injunction against this defendant.

"Second.    The court erred in making the order dated August 9, 1913, denying the motion of the defendant to dissolve said temporary injunction.

"Third.    The court erred in his final decree dated the 10th day of September, 1914, in not dissolving the said temporary injunction.

"Fourth.    The court erred in his final decree dated the 10th day of September, 1914, by ordering and decreeing that the defendant pay one-half of the cost in said cause, including the Master's fees and the witness fees."

It appears from the record that the appellant is the owner of the following described land in Manatee county:    Northwest quarter of the Northwest quarter of Section Twenty-five, the East half of the Northeast quar-

ter of Section Twenty-six, and that portion of the South-west quarter of the Southwest quarter of Section Twen-ty-four lying south of Bole's Creek, all in Township Thirty-five, Range Seventeen East, and that the defend-ant owns all of Section Twenty-five except the North-west quarter of the Northwest quarter, and the North-east quarter of the Northeast quarter of the Northwest quarter of that Section, and that it also owns the East half of the Southeast quarter of Section Twenty-six, same Township and Range.

A creek known as Bole's Creek enters the Southwest quarter of the Southwest quarter of Section Twenty-four near the Northeast corner and running in a west-erly course bends to the southward and enters the North-east quarter of the Northeast quarter of Section Twen-ty-six, then running westerly and then southwesterly traverses the Northwest quarter of the Northeast quar-ter of Section Twenty-six. The creek empties into Sar-asota Bay. Running into this creek from the south at a point near the center of the northern line of the North-east quarter of the Northeast quarter of Section Twenty-six is a creek or natural drain which finds its source in the Northeast quarter of Section Thirty-six, runs in a northwesterly direction into a pond in the Southwest corner of Section Twenty-five, thence out of that pond northward through the east half of the Northeast quar-ter of the Southeast quarter of Section Twenty-six, then northwesterly through the Southeast quarter of the Northeast quarter of that section, and then northerly through the Northeast quar-ter of the Northeast quarter of that section until it reaches Bole's Creek. This creek is known as Callan's

drain or creek. The defendant company constructed a ditch which intersecting this drain in the Northeast quarter of the Southeast quarter of Section Twenty-six about forty rods south of the half section line extends east in a straight line to a point sixty-two feet east of the Northwest quarter of the Southeast quarter of Section Twenty-five. The ditch is entirely on appellee's land and empties into Callan's drain where that creek passes through the land of the appellee. This ditch was constructed for the purpose of draining a portion of the appellee's land in Section Twenty-five of its surface water. It appears that from the head of the ditch in the eastern part of Section Twenty-five the land for some distance north and south has a natural slope westward toward the Callan drain, but the land being of the character known as "flat pine land," the water during a rainy season spreads over it some to the southward, flowing into ponds forming the source of Callan's drain, and some to the northward flowing into Bole's Creek through drains known as Stebbins and Evans runs, and through a drain known as "Callan's East Run," the southern points of which two last mentioned drains are about three-eighths to half a mile north of the ditch. The carrying capacity of the ditch at the point of intersection with Callan's Run is 118 cubic feet per second. At the narrowest point of Callan's drain, which is about 700 feet north of the mouth of the ditch, the carrying capacity of the drain is 632.9 c. f. s. At the point where the drain empties into Bole's Creek the appellant for many years was accustomed to use a roadway crossing the run or drain by fording; he eventually built a dam across it and opened a run to the eastward of a "flat" which varies

in width from twenty-five feet at the south end to two hundred feet at the north end. Callan placed a bridge across the run which he opened to the eastward of this flat which made for him a good roadway to Bradentown and Sarasota saving several miles of travel when going to and from those places. The dam formed a reservoir of fresh water which covered the "flat" and was used by appellant for irrigating purposes and a fresh water fish pond. The discharge capacity of the drain at its mouth notwithstanding the dam is 2211 c. f. s. according to the testimony of the witness C. F. Brush, a civil engineer, who also testified that if the dam was removed the cross section area of the drain would show a "discharge capacity of 5903 c. f. s." "The drainage area which effects this canal and run is approximately 800 acres, or with four inches rainfall in 24 hours gives 134.4 c. f. s. Assuming this rainfall of 4 inches in 24 hours is carried away by Callan's Run, however, with the growth of palmettos, grasses, weeds and trees, approximately 75% of this only will run off in 24 hours, thus lessening the required area necessary to carry off this water." Again: "The drainage area of 800 acres can not have at 4 inches of rainfall in 24 hours sufficient water to fill Callan's Run at its mouth to the tops of the banks, the capacity of the Callan Run based on a four-inch rainfall on the grade which now exists will handle the run of some 13,280 acres."

The testimony does not show that the canal cut by appellee has cast upon appellant's property a greater burden than the natural drainway imposes upon it, although there is some evidence to the effect that since the construction of the canal the dam has washed away to "such

an extent that it cannot be used as a wagon way after heavy rains." The testimony of the witnesses vary as to the quantity of water that might be carried into the natural drain by the canal, the effect likely to be produced by it upon the lands lying below it and along the natural drain, the natural slope of the land in Section Twenty-five, and the course in which the water flows on different parts of the section, but there is nothing in the testimony to justify the conclusion that the appellee by constructing the ditch has diverted any of the surface waters upon Section Twenty-five into the Callan drain. It does not appear that any of the surface waters upon Section Twenty-five have been turned into the Callan drain that would not have found their way to this natural outlet if the ditch had not been constructed. Nor is it apparent from the record that even during an excessive or unusual rainfall the Callan drain would be taxed beyond its capacity by reason of the ditch constructed by appellee, although on this point expert and non-expert opinion evidence clash.

So far as the facts are concerned, therefore, we think the Chancellor's decree should not be disturbed because in a case like this, where one for the purpose of draining his lands digs ditches which empty their flow of waters into a natural drain running through his land, whether the limit of his right be the capacity of the natural drain, or whether he is subject only to the limitation of diversion, the evidence does not show that appellee exceeded his right upon the one theory or the other.

Solicitors for appellee insist that the demurrer should have been sustained and the bill dismissed, but this position cannot be sustained, as both the original and

amended bills charge the appellee with the diversion of surface waters into the Callan drain causing it to overflow and thus putting a heavier burden upon the riparian lower proprietor. And the amended bill distinctly alleges that the flow of water through appellee's canal will tax the Callan drain beyond its capacity, to appellant's injury.

We think the temporary injunction should have been dissolved, as the allegations of the bill were not sustained in the judgment of the Chancellor, and we find ample evidence in the record to sustain his conclusion.

The appellee appears to have been entirely within its rights in constructing the ditch, in that it does not appear from the record that the ditch caused the diversion of any water from its natural flow, nor that the collection of the water in the ditch and the emptying of it into the Callan drain taxed it beyond its capacity, although it may have accelerated and increased its flow.

"Callan's drain" appears both from the bill of complaint and the evidence to be a creek or stream which rising in ponds upon the lower portion of Section Twenty-five and the northern part of Section Thirty-six, traverses appellee's land and flows into Bole's Creek. There is ample evidence to support the conclusion that a part of appellee's land in the region of the ditch slopes toward this creek into which the "drains" upon the land empty the surface waters. "Callan's drain" therefore is a watercourse such as appellee had the right to use for draining into it the surface water from its land by means of a ditch. The extent to which it could use "Callan's drain" for that purpose involves a point upon which the authorities are not in accord.

The Supreme Court of North Carolina in the case of Mizell v. McGowen, 129 N. C. 93, 39 S. E. Rep. 729, 85 Am. St. Rep. 705, seems to have held that the dominant tenant had the right to carry off his surface water by cutting ditches by which the flow of water naturally flowing therein was increased and accelerated and discharged on the land of the servient tenant, and that the plaintiff was left to the sole question of diversion. In that case the court declined to follow the doctrine of "capacity test of the natural outlet" and condemned it as impractical and impossible of application. Said the court: "Suppose the upper tenant were compelled to regard the natural capacity of the stream, how far down would this limitation extend? Naturally many others would drain into the same stream, so that the land owner near its mouth would get the accumulated waters of all above him. In case of injury how would he apportion his damages and where would the liability of each tort feasor begin and end?"

On the other hand many authorities apply the "capacity" test; but as the appellee was not shown to have violated that rule, nor the one against diversion, was it proper to continue against it an injunction against the possibility of its violating the former rule where there is nothing to show that the water from the ditch will tax the natural water course beyond its capacity to the injury of appellant, who has no more right to diminish its capacity by obstructions such as dams or causeways than appellee has to increase its flow beyond its capacity by draining the surface water from his land into it?

Upon the final hearing the Chancellor should have dis-

missed the bill at the cost of complainant, and it is so ordered.

TAYLOR, C. J., and SHACKLEFORD and WHITFIELD, JJ., concur.

COCKRELL, J., absent by reason of sickness.